1

2

3

4

5

6

7                    UNITED STATES DISTRICT COURT

8                   EASTERN DISTRICT OF CALIFORNIA

9

10  VIRGINIA C. MOON, on her own        No. 2:11-CV-03102-GEB-CKD
    behalf and on behalf of the
11  Peters Rush Habib & McKenna
    401(k) Profit Sharing Plan,
12                                      **ORDER GRANTING IN PART AND**
              Plaintiff,                **DENYING IN PART MOTIONS FOR**
13                                      **SUMMARY JUDGMENT**
         v.
14
    DAVID H. RUSH, MARK A. HABIB,
15  and JAMES P. MCKENNA,

16            Defendants.

17
    _____
18
    AND RELATED COUNTERCLAIM.
19

20

21          Plaintiff  and  Counter-Defendant  Moon  and  Defendants

22  Rush,  Habib,  and  McKenna  (collectively  the  "Defendants")  each

23  move  for  summary  judgment  on  claims  one  through  five  in

24  Plaintiff's  Complaint  ("Compl."). Defendants  also  seek  summary

25  judgment  on  the  six  remaining  claims  in  the  Complaint. Counter-

26  Claimant  Rush  seeks  summary  judgment  on  all  three  claims  in  his

27  Second  Amended  Counterclaim  ("Countercl.").

28
                                 1

1

## I.  LEGAL STANDARD

A party seeking summary judgment bears the initial burden of demonstrating the absence of a genuine issue of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). "A fact is 'material' when . . . it could affect the outcome of the case." Thrifty Oil Co. v. Bank of Am. Nat'l Trust & Sav. Ass'n, 322 F.3d 1039, 1046 (9th Cir. 2003) (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986)). An issue of material fact is "genuine" when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson, 477 U.S. at 248.

If the movant satisfies its "initial burden," "the nonmoving party must set forth, by affidavit or as otherwise provided in Fed. Rule Civ. Proc. ("Rule") 56, 'specific facts showing that there is a genuine issue for trial.'" T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n, 809 F.2d 626, 630 (9th Cir. 1987) (quoting former Rule 56(e)). Summary judgment "evidence must be viewed in the light most favorable to the nonmoving party, and all reasonable inferences must be drawn in favor of that party." Sec. & Exch. Comm'n v. Todd, 642 F.3d 1207, 1215 (9th Cir. 2011) (citing Johnson v. Paradise Valley Unified Sch. Dist., 251 F.3d 1222, 1227 (9th Cir. 2001)).

Further, Local Rule 260(b) prescribes:

> Any party opposing a motion for summary judgment . . . [must] reproduce the itemized facts in the [moving party's] Statement of Undisputed Facts and admit those facts that are undisputed and deny those that are disputed, including with each denial a citation to the particular portions of any pleading, affidavit, deposition, interrogatory answer, admission, or other

2

document relied upon in support of that denial.

If the nonmovant does not "specifically . . . [controvert duly supported] facts identified in the [movant's] statement of undisputed facts," the nonmovant "is deemed to have admitted the validity of the facts contained in the [movant's] statement." Beard v. Banks, 548 U.S. 521, 527 (2006).

> Because a district court has no independent duty "to scour the record in search of a genuine issue of triable fact," and may "rely on the nonmoving party to identify with reasonable particularity the evidence that precludes summary judgment," . . . the district court . . . [is] under no obligation to undertake a cumbersome review of the record on the [nonmoving party's] behalf.

Simmons v. Navajo Cnty., Ariz., 609 F.3d 1011, 1017 (9th Cir. 2010) (quoting Keenan v. Allan, 91 F.3d 1275, 1279 (9th Cir. 1996)).

## II.   STATEMENT OF UNCONTROVERTED FACTS

The following uncontroverted facts concern the motions.

### A.   The Marriage/Dissolution of Moon and Rush

Rush and Moon were married on March 21, 1977. (Pl. Resp. Defs. SUF ("Defs. SUF") ¶ 1, ECF No. 119.) Moon filed a petition in state family court for dissolution of the marriage in 1994. (Defs. SUF ¶ 14.) In connection with their divorce, Rush and Moon entered into a domestic relations order ("DRO") "which was intended to divide the marital community's assets in the [Peters, Rush, Habib & McKenna] 401(k) Profit Sharing Plan ("the Plan")." (Defs. SUF ¶ 19.) The DRO was signed and filed in September 1995, and the final dissolution was entered on September 26, 1995. (Defs. SUF ¶¶ 23, 18.)

3

1    Moon, through her family law counsel, served a copy of
2    the DRO on Rush at his home address on October 31, 1995. (Defs.
3    SUF ¶ 27.) Moon did not present the DRO to David Fuller, who was
4    then the Plan Administrator. (Defs. SUF ¶¶ 33, 35.)

5    The Plan currently holds a 20.2881% interest in a 40-
6    acre Property at 1525 Dayton Road in Chico, California ("the
7    Property") "for Moon's benefit." (Defs. SUF ¶ 74.)

8    **B.   The Plan**

9    The Plan maintains separate accounts for each
10   individual participant and/or beneficiary. (Defs. Resp. Pl. SUF
11   "Pl. SUF") ¶ 1, ECF No. 111.) Each participant and/or beneficiary
12   of the Plan is permitted to direct the investments of the assets
13   in his or her account. (Pl. SUF ¶ 2.)

14   Rush was a Discretionary Trustee of the Plan until
15   January 1, 2013, at which time he became a Special Trustee. (Pl.
16   SUF ¶ 3.) He has never been a Plan Administrator. (Defs. SUF ¶
17   30.) Habib is the current Plan Administrator. (Pl. SUF ¶ 4.)
18   McKenna is a Trustee of the Plan. (Pl. SUF ¶ 5.)

19   When Rush received the DRO from Moon in 1995, he did
20   not share it with other Plan Trustees. (Pl. SUF ¶ 12.)

21   **C.   The Property**

22   Sometime in 1995 or 1996 after the divorce, Moon took
23   over complete control of the Property. (Defs. SUF ¶ 56.) Moon
24   personally held a 79.7119% interest in the Property and the Plan
25   held a 20.2881% interest. (Defs. SUF ¶ 55.) In 1997 Rush loaned
26   Moon $75,000, and they agreed Moon would sell Rush a 49%
27   ownership interest in the Property with the loan used as partial
28   payment. (Defs. SUF ¶¶ 75-76.) In 1998 or 1999, Rush became a

4

partial owner of the Property; he personally owned a 49% interest, Moon personally held a 30.7119% interest, and the Plan held a 20.2881% interest. (Defs. SUF ¶¶ 81-82.) Moon and Rush dispute the terms of their 49% ownership agreement. However, it is uncontroverted that Rush deposited income generated by the Property "into Moon's checking account in Chico." (Defs. SUF ¶ 88.) Moon transferred 2% of her personal ownership interest to Rush in January 2000, resulting in Rush having a 51% interest in the Property, Moon personally having a 28.7119% interest, and the Plan having a 20.2881% interest. (Defs. SUF ¶ 99.)

In early 2000, Rush told Moon she owed him 49% of the Property's "net" rental income "for calendar year 1999," which she paid. (Defs. SUF ¶ 94.) In 2002, he sent her an accounting statement through December 31, 2001, which Moon paid. In June 2003, Rush sent Moon an accounting for 2002, which she paid. (Defs. SUF ¶¶ 108-09.) Rush sent Moon accounting statements for 2003-2008. (Defs. SUF ¶¶ 116, 121, 126, 131, 137). Moon received the 2003-2008 statements, but did not pay Rush. (Defs. SUF ¶¶ 117, 119, 122, 124, 127, 129, 132, 135, 139, 141.)

From 2003 to mid-2009 Moon received 100% of the income generated by the Property; specifically, $225,500. (Defs. SUF ¶ 143.) "Although Moon received $225,500 in income from the Property from 2003 to mid-2009, Moon did not report on her federal income tax returns any income related to the Property for tax years 2003-2009." (Defs. SUF ¶ 144.) "Moon has never offered or made any effort to transmit any portion of the income she received from the Property from 2003 to mid-2009 to the Plan, despite her present argument that the Plan was entitled to

1  receive some portion of this income." (Defs. SUF ¶ 145.) "From
2  2003 to 2008, although Rush claimed credit for mortgage interest
3  and taxes paid by Moon, he also reported the entirety of all
4  income earned from rental of the Property, even though he
5  received none of it." (Defs. SUF ¶ 146.) "From 2003, when Moon
6  began retaining all rents for the Property, through at least June
7  2009, Moon paid alarm monitoring and property tax expenses for
8  the Property." (Defs. SUF ¶ 153.) Rush personally advanced
9  expenses for the Property in 2003-2008. (Defs. SUF ¶¶ 118, 123,
10 128, 133, 134, 140.)

11      In June 2009, Rush began retaining rents received for
12 the Property instead of depositing them into Moon's checking
13 account, and since January 1, 2013, Rush has deposited all income
14 from the Property into a segregated savings account. (Defs. SUF
15 ¶¶ 152, 254.)

16      **D.   Property Valuations Over Time**

17      In 1997, a realtor estimated the Property was worth
18 between $800,000 and $850,000. (Defs. SUF ¶¶ 191-192.) In 2002,
19 the appraised value of the Property was $1,150,000. (Defs. SUF ¶¶
20 193-194.) In November 2003 an appraiser opined that the Property
21 "was worth $2,600,000" based on the assumption of an
22 extraordinary hypothetical condition that the property would not
23 be impacted by the Green Line. (Defs. SUF ¶¶ 171, 173.) The Green
24 Line is a boundary line in Chico outside of which development is
25 restricted to protect agricultural lands. (Defs. SUF ¶ 175.)
26 "Moon's expert witness . . . stated that, 'According to the Chico
27 City and Butte County planners, the likelihood of altering the
28 Green Line at this location is very low.'" (Defs. SUF ¶ 176.)

1    In 2009, the Property was appraised at $850,000, and in

2  2014, different appraisers valued the Property: one at $500,000

3  and the other at $850,000. (Defs. SUF ¶¶ 199, 205, 216.)

4      **E.   Moon's Requests for Plan Assets Information**

5    Habib became the Plan Administrator in either 1996 or

6  1997. (Defs. SUF ¶ 36.) Moon did not provide him with a copy of

7  the DRO until 2010. (Defs. SUF ¶ 38.)

8    On February 25, 2010, Moon's counsel wrote Habib

9  requesting plan documents, including a pension benefit statement.

10  (Defs. SUF ¶ 233.)

11    Habib acknowledged the letter on March 4, 2010. (Defs.

12  SUF ¶ 242.) On April 10, 2010, Moon's counsel informed Habib that

13  his thirty-day period to respond to her document request had

14  expired, and counsel reiterated the request for documents. (Pl.

15  SUF ¶ 23.)

16    On or around June 2, 2010, Habib informed Moon's

17  counsel "that he was unable to provide any of the documents

18  requested in the February 25, 2010 letter until he received a

19  written authorization signed by Moon, which was not included with

20  the February 25, 2010 letter."  (Defs. SUF ¶ 243, Pl. SUF ¶ 24.)

21  Moon provided written authorization through her counsel on June

22  16, 2010, and Habib provided the requested documents on June 22,

23  2010. (Defs. SUF ¶¶ 244-245.)

24    Prior to Habib's June 2010 request for Moon's written

25  authorization to release the documents to her attorney, Moon had

26  never received communication from the Plan about the DRO and had

27  not been provided a pension benefit statement. (Pl. SUF ¶ 27;

28  Defs. SUF ¶ 241.) Habib has not provided Moon with a pension

7

1   benefit statement since his June 2010 communication. (Pl. SUF ¶
2   29.)

3       In October 2011, Moon's attorney sent a letter to Habib
4   requesting formal notice that the DRO had gone through the Plan's
5   qualification process. Habib responded in November 2011 that the
6   Plan did not consider the DRO qualified. (Defs. SUF ¶ 247-249.)
7   The Plan first established procedures for qualifying a DRO in
8   November 2011. (Pl. SUF ¶ 32.)

9                          **III. DISCUSSION**

10      **A.   Qualification of Moon's DRO**

11      Moon alleges in several of her claims that Defendants
12  violated statutory duties owed to her under the Employee
13  Retirement Income Security Act ("ERISA"), as a result of her
14  alternate payee Plan beneficiary status and their status as
15  fiduciaries of the Plan.

16      Under ERISA a fiduciary owes duties to plan
17  beneficiaries. See 29 U.S.C. § 1104(a)(1) (setting forth the
18  fiduciary duties under ERISA, which include the duty to act "with
19  the care, skill, prudence, and diligence under the circumstances
20  then prevailing that a prudent man acting in like capacity and
21  familiar with such matters would use ..."). Further a plan
22  "trustee is a fiduciary" under ERISA, N.L.R.B. v. Amax Coal Co.,
23  453 U.S. 322, 334 (1981), and "ERISA assigns to plan
24  administrators the fiduciary duty to ensure that an alternate
25  payee's rights are protected." Stewart v. Thorpe Holding Co.
26  Profit Sharing Plan, 207 F.3d 1143, 1156 (9th Cir. 2000). Rush,
27  McKenna and Habib are Plan Trustees and Habib is also a Plan
28  Administrator. (Pl. SUF ¶¶ 3-5.) Therefore, each Defendant owes a

                                  8

1   fiduciary duty to plan beneficiaries.

2   ERISA "confers beneficiary status on a nonparticipant
3   spouse . . . in only narrow circumstances delineated by its
4   provisions." Boggs v. Boggs, 520 U.S. 833, 846 (1997). The ERISA
5   statutory definition of "beneficiary" includes "[a] person who is
6   an alternate payee under a qualified domestic relations order
7   ["QDRO"]." 29 U.S.C. § 1056(d)(3)(J). "A QDRO is a subset of
8   'domestic relations orders' that recognizes the right of an
9   alternate payee to 'receive all or a portion of the benefits
10  payable with respect to a participant under the plan." Hamilton
11  v. Wash. State Plumbing & Pipefitting Indus. Pension Plan, 433
12  F.3d 1091, 1096 (9th Cir. 2006) (citation omitted). "The term
13  'alternate payee' means any . . . former spouse. . . of a
14  participant who is recognized by a domestic relations order as
15  having a right to receive all, or a portion of, the benefits
16  payable under a plan." 29 U.S.C. § 1056(d)(3)(K).

17  Further, Moon argues that the California Court of
18  Appeal held in In re Marriage of Rush, C070841, 2014 WL 2795475
19  (Cal. Ct. App. June 20, 2014)(unpublished disposition) that the
20  DRO is qualified and therefore, she is a beneficiary under the
21  Plan.

22  Defendants counter that Moon has not established she a
23  beneficiary under the Plan, and argue that "[n]either the
24  September 26, 1995 domestic relations order nor the California
25  Court of Appeals decision in In re Marriage of Rush establish
26  that 'Moon is a beneficiary of the Plan.'" (Pl. SUF ¶ 11.)

27  Defendants' argument disregards the content of the DRO
28  and the evident holding In re Marriage of Rush.  The appellate

9

1    court held in In re Marriage of Rush that the subject DRO is

2    "presumptively qualified, subject only to modifications agreed

3    upon by the parties or ordered by the court to save the DRO from

4    being legally ineffective." Id. at *2.

5            Further, the context in which In re Marriage of Rush

6    issued, indicates the decision rebuked Habib's attempt to avoid

7    his obligations to Moon under the Plan.  In December 2011, after

8    Moon's counsel requested written confirmation from Plan

9    Administrator Habib that Moon's DRO was qualified, Habib

10   responded that it was not qualified and then intervened in the

11   long dormant divorce proceedings between Moon and Rush seeking to

12   have the state court determine if Moon's DRO was qualified. The

13   state court held the DRO was not qualified "because it did 'not

14   provide a basis for determining what is [Rush's] separate

15   interest in the plan and what is the community interests.'" Id.

16   at *3 (alterations in original). Moon appealed, and the Court of

17   Appeal reversed in In re Marriage of Rush, holding the family

18   court's "ruling on qualification was erroneous." Id. at *5-6. The

19   Court of Appeal stated:

20           The 'pivotal question' [in determining if a
             DRO is qualified] is whether the dissolution
21           order contains enough information for the
             plan administrator to make an informed
22           decision about distribution. Substantial
             compliance with the requirements is
23           sufficient.

24           Inclusion of the term "community
             interest" in the DRO does not render the DRO
25           unqualified. The wording may create some
             ambiguity in this case, but not enough to
26           render the plan unqualified at such a late
             date.
27
             Community property interests are those
28           acquired during marriage. [Rush] declared

                                10

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

>that he could not distinguish contributions
>he made to the plan during his marriage to
>[Moon] from those he made beforehand.
>However, both [Rush] and Habib had access to
>the plan's records, including the dates and
>amounts for [Rush's] contributions to the
>plan. Neither claimed to have made an attempt
>to identify or trace [Rush's] separate
>property interest.

>Before the dissolution, [Rush] and
>[Moon] were required by law to disclose to
>one another and to the family court "[a]ll
>material facts and information regarding the
>characterization of all assets and
>liabilities." When parties divide pension
>assets, the party with better access to
>information about the assets "must acquire
>and disclose such information to the other
>spouse." In this case, [Rush] necessarily had
>superior (and perhaps exclusive) access to
>information about his own pension assets,
>including the extent to which his pension
>fund's investment in the disputed real
>property was traceable to separate rather
>than community property. He had an
>affirmative duty to discover and disclose the
>facts to [Moon] before they dissolved their
>marriage and he offers no explanation for not
>disclosing the same facts to his law partner,
>the plan administrator, in order to identify
>and segregate any separate property
>interests. Tellingly, [Rush] did not ask the
>family court to characterize some or all of
>the disputed property interest as separate;
>he asked the family court to declare the
>order he had negotiated unqualified and
>ineffective.

Id. at *3-4 (citations omitted).

The appellate court also explained in In re Marriage of
Rush that the Plan's challenge to Moon's status as a Plan
beneficiary was untimely, stating:

>If a plan administrator fails to timely
>object to a DRO, however, "it makes no sense
>to punish a spouse for a plan's dereliction."
>Rather, a DRO may be declared a QDRO based on
>the plan administrator's inaction. And the
>plan need not be a party to a dissolution
>proceeding to be bound by the terms of a
>QDRO.

1
2
3
4

           The plan's request for a declaration that the DRO was not qualified—brought 16 years after [Rush] signed the DRO as a party and trustee, and 18 months after the plan administrator acknowledged it in writing—was unreasonable and untimely. . . .

5

    . . . .

6
7
8
9
10
11

           A QDRO does not create a new property interest, but renders enforceable an already existing interest, so the alternate payee's right to an enforceable QDRO is presumed during any period of DRO refinement. Here, the DRO was clearly intended by [Rush] and [Moon], and by the family court in 1995, to effectively transfer the entire community share of the disputed property to [Moon]. The family court's ruling on qualification was erroneous.

12

The family court order. . . is reversed.

13

Id. at *5-6 (emphasis and citations omitted).

14

It is evident that the state court DRO is a QDRO under

15

ERISA and that the Plan Administrator's indication otherwise is

16

not supported by the record. Further, Moon is an alternate payee

17

under the QDRO and a Plan beneficiary within the meaning of 29

18

U.S.C. § 1056(d)(3)(K).

19

   **B.   Claims 1 and 2: Breach of Statutory Duty**

20

       **1. Claim 1: 29 U.S.C. § 1025(a)**

21

Moon and Habib each seek summary judgment on claim one

22

in Moon's Complaint, in which Moon alleges that as Plan

23

Administrator Habib breached the statutory duty he owed her under

24

ERISA 29 U.S.C. § 1025(a), which require him to provide her a

25

pension benefit statement at least once each calendar quarter

26

beginning January 1, 2007.  Habib has only sent Moon one pension

27

benefit statement for the second quarter of 2010. (Pl. SUF ¶¶ 27,

28

29; Defs. SUF ¶ 241.)

1    Section 1025(a) prescribes in part:

2    The administrator of an individual account
     plan . . . shall furnish a pension benefit
3    statement--

4    (i) at least once each calendar quarter to a
     participant or beneficiary who has the right
5    to direct the investment of assets in his or
     her account under the plan . . . .
6
     It is uncontroverted that beneficiaries of the Plan are
7
     permitted to direct the investment of the assets in their own
8
     accounts. (Pl. SUF ¶ 2.) It is also uncontroverted that Habib has
9
     been the Plan Administrator since 2007; that prior to June 22,
10
     2010 he never provided Moon with a pension benefit statement; and
11
     since June 22, 2010 he has not provided Moon with another pension
12
     benefit statement. (Defs. SUF ¶ 26; Pl. SUF ¶¶ 27-29.) Therefore,
13
     Moon has shown Plan Administrator Habib violated his statutory
14
     duty pursuant to § 1025(a).
15
                    **2. Claim 2: 29 U.S.C. § 1024(b)(4)**
16
          Moon and Habib each seek summary judgment on claim two
17
     in Moon's Complaint, in which Moon alleges that as Plan
18
     Administrator Habib breached the statutory duty he owed her,
19
     ERISA under 29 U.S.C § 1024(b)(4), which requires him to timely
20
     provide her requested plan documents. Section 1024(b)(4) provides
21
     that "[t]he administrator shall, upon written request of any
22
     participant or beneficiary, furnish a copy of the latest updated
23
     summary plan description, and the latest annual report, any
24
     terminal report, the bargaining agreement, trust agreement,
25
     contract, or other instruments under which the plan is
26
     established or operated." 29 U.S.C. § 1132(c)(1) requires a Plan
27
     Administrator to respond within thirty days of a written request
28
                                    13

1   or risk sanctions of up to $110 per day for delay.

2          Moon contends in her capacity as a Plan beneficiary she

3   sent Habib a written request for plan documents dated February

4   25, 2010. Habib acknowledged receipt of the letter on March 4,

5   2010. (Defs. SUF ¶ 242.) Moon argues Habib "did not provide the

6   [requested] documents until June 22, 2010." (Pl. Mot. 10:11.)

7   Habib counters he has not violated § 1024(b)(4) because he

8   provided Moon copies of the requested documents eight days after

9   Moon sent him, through her attorney, written authorization to

10  release the requested documents to her attorney. (Defs. Unsealed

11  Notice & Mot. Summ. J. ("Defs. Mot.") 8:15-17, ECF No. 107.)

12  Habib contends his obligation to respond to Moon's document

13  request did not commence until he received a written

14  authorization from Moon authorizing her attorney to receive the

15  documents on her behalf.

16         A Plan Administrator is not "obliged to disclose any

17  documents to [a Plaintiff's] attorney without written

18  authorization from" the beneficiary. Bartling v. Fruehauf Corp.,

19  29 F.3d 1062, 1072 (6th Cir. 1994). However:

20             a [P]lan [A]dministrator is not entitled to
               ignore a request for pension benefits
21             information made by an attorney on behalf of
               a participant . . . Instead, a [P]lan
22             [A]dministrator must either provide the
               requested information to the plan beneficiary
23             . . . or must . . . inform the attorney that
               the information will be released upon the
24             receipt of an authorization signed by the
               plan participant. A [P]lan [A]dministrator
25             who fails to take either of these steps
               within the thirty day period imposed by 29
26             U.S.C. § 1132(c) is subject to the fines
               authorized by that same provision, at the
27             discretion of the district court.

28  Minadeo v. ICI Paints, 398 F.3d 751, 758 (6th Cir. 2005).

                                  14

1    Since it is uncontroverted that Habib received Moon's
2  February 25, 2010 plan document request by March 4, 2010, he had
3  an obligation to respond within thirty days, by either providing
4  the requested documents to Moon or informing Moon's attorney that
5  the documents would only be released upon receipt of written
6  authorization from Moon. He did neither. (Defs. SUF ¶ 244.) Habib
7  did not provide Moon with the documents until well beyond the
8  thirty day statutory period within which he was required to
9  respond. Therefore, Moon has shown Habib violated § 1024(b)(4).

10                    **3. Statutory Penalties**

11   An administrator who fails to comply with his duties
12  under either section 1025(a) or section 1024(b), "may in the
13  court's discretion be personally liable" to the requesting
14  beneficiary for statutory penalties. 29 U.S.C. § 1132(c)(1); 29
15  C.F.R. §2575.502c-1 (increasing the maximum statutory penalty
16  from $100 per day to $110 per day for violations occurring after
17  July 29, 1997). "Whether to impose statutory penalties and the
18  amount of those penalties (up to $110 a day) is discretionary."
19  Hemphill v. Estate of Ryskamp, 619 F. Supp. 2d 954, 975 (E.D.
20  Cal. 2008). "Appropriate factors to be considered . . . include
21  [1] bad faith or intentional misconduct on the part of the
22  administrator, [2] the length of the delay, [3] the number of
23  requests made and documents withheld, and [4] the existence of
24  any prejudice to the participant or beneficiary." Hemphill, at
25  976 (citing Romero v. SmithKline Beecham, 309 F.3d 113, 129 (3d
26  Cir. 2002)); Zann Kwan v. Andalex Group LLC,737 F.3d 834, 848
27  (2nd Cir. 2013)(same). Section 1132 penalties are "meant to be
28  in the nature of punitive damages, designed more for the purpose

15

of punishing the violator than compensating the participant or beneficiary." <u>Scott v. Suncoast Beverage Sales, Ltd.</u>, 295 F.3d 1223, 1232 (11th Cir. 2002); <u>see also</u> <u>Starr v. Metro Sys., Inc</u>. 461 F.3d 1036, 1040 (8th Cir. 2006) ("The purpose of [ERISA's statutory penalties] is to provide plan administrators with an incentive to comply with the requirements of ERISA. . . and to punish noncompliance.").

### a.    Penalties for Claim One

Moon seeks the maximum statutory penalty under § 1025(a) for every day in each calendar quarter in which Habib failed to provide her with a pension benefit statement from January 1, 2007 through the first quarter of 2010, and from the third quarter of 2010 to the present.

### 1. Bad Faith or Intentional Misconduct

Plan Administrator Habib argues his failure to provide Moon a pension benefit statement was not because of bad faith or intentional misconduct, since he was not the Plan Administrator when Moon's DRO was signed and he did not have knowledge of the DRO until 2010.

Moon argues Habib's lack of knowledge about the "QDRO prior to 2010" does not prevent a finding that he acted in bad faith for failing to provide her quarterly pension benefit statements because he "knew about Mr. Rush's divorce from Ms. Moon, and was aware for years that both the Plan and Ms. Moon individually owned interests in the . . . [P]roperty, but never asked Mr. Rush or anyone else whether any Plan assets were involved in the divorce settlement or whether the divorce affected the Plan in any way." (Pl. Mot. 12:11-16.) Moon also

16

1   argues that Habib's bad faith is evidenced by his refusal to
2   provide her quarterly pension benefit statements even after the
3   California appellate court ruled that the DRO is qualified.

4          Moon has not shown that Habib's failure to provide her
5   with quarterly pension benefit statements before his receipt of
6   Moon's February 25, 2010 letter demonstrates that his failure
7   stemmed from bad faith or intentional misconduct. However, Habib
8   did not begin sending Moon quarterly pension benefit statements
9   after he received the February 25, 2010 letter from Moon's
10  counsel.  This failure continued even after the California
11  appellate court made clear in In re Marriage of Rush, C070841,
12  2014 WL 2795475, at *2, on June 20, 2014 that Moon is a
13  beneficiary of the Plan pursuant to the DRO which "is
14  presumptively qualified".  Therefore, Moon has shown that Habib
15  acted in bad faith or committed intentional misconduct when he
16  failed to provide her quarterly pension benefit statements after
17  receiving the February 25, 2010 communication.

### 2.   Length of Delay

19         Moon argues Habib continues to violate § 1025(a)
20  because he has not provided her with a quarterly pension benefit
21  statement since June 2010, and she is entitled to one each
22  calendar quarter. (Pl. SUF ¶ 29.) Habib failed to respond to this
23  argument. Therefore, Habib's delay in providing Moon with
24  quarterly pension benefit statements is ongoing since he has not
25  provided Moon with a quarterly pension benefit statement since
26  June 2010 and his ongoing violation weighs in favor of imposing a
27  penalty.
28  ///

### 3.   Number of Requests

Habib argues Moon's single request for a pension benefit statement weighs against imposing a penalty. Moon counters that unlike her written request for plan documents, ERISA does not require her to request pension benefit statements before Habib's obligation to provide them to her is triggered.

### 4.   Prejudice

Habib argues Moon suffered no prejudice as a result of his failure to timely provide her with quarterly benefit statements, contending that from the time she and Rush signed the DRO in 1995 until 2009, she received 100% of the income attributable to the Plan under the DRO; and, therefore even if had been alerted to the dispute regarding her ownership in the Plan's interest in the Property she could not have received additional income from the Plan. Habib also argues any prejudice Moon claims to have suffered is due to her own inaction rather than his breach since she failed to communicate with the Plan Administrator for fifteen years after the DRO was entered.

Moon contends she "has invested years and many thousands of dollars in attorney's fees in trying to obtain a clear statement of her interest in the Plan, and since Defendants have repudiated the Pension Benefits Statement, she still does not even have one." (Pl. Mot., 11:8-10, ECF No. 97.) Moon further argues: "If she had been provided with complete and accurate quarterly statements as she should have been, she would have known since at least 2006 that there was a dispute as to her ownership of the Plan's interest in the . . . [P]roperty, because the statement would have had to indicate the value of her portion

18

1    (as opposed to Rush's asserted separate property portion)." (Pl.

2    Mot. 11:10-14.) She also argues she was "hampered in her ability

3    to pursue fiduciary breach claims based on Defendants'

4    administration of the Plan and Rush's self-dealing with respect

5    to the Property because she had no idea there was any issue with

6    the QDRO's allocation of the Plan's interest in the Property to

7    her" as a result of Habib's failure to perform his duties as Plan

8    Administrator. (Pl. Reply ISO Mot. Summ. J. ("Pl. Mot. Reply,")

9    8:6-9, ECF No. 120.)

10           Moon also submits a declaration in which she declares

11   that she "did not know before 2011 that Mr. Rush believe[d] that

12   he has a separate property interest in the Plan's share of the

13   [Property] or that there was any problem with the QDRO." (Decl.

14   Moon ISO Opp'n Countercl. Rush's MSJ ¶ 14, ECF No. 117.)

15           Moon has shown she is still deprived of quarterly

16   pension benefit statements. Although it is unclear whether she

17   has suffered prejudice as a result of Habib's ERISA statutory

18   violations, a lack of prejudice does not exonerate Habib's

19   failure to timely provide Moon with Plan documents. Godwin v. Sun

20   Life Assur. Co. of Canada, 980 F.2d 323, 327 (5th Cir. 1992)

21   ("section 1132 does not require the claimant to show he was

22   prejudiced to be entitled to penalties"); Kaiser Permanente Emp.

23   Pension Plan v. Bertozzi, 849 F. Supp. 692, 702 (N.D. Cal. 1994)

24   ("Although prejudice is not required to prevail on a section

25   1132(c) penalty claim, most courts do inquire as to whether the

26   claimant has suffered some type of prejudice before exercising

27   the discretion vested in them under section 1132(c).").

28           Considering the factors involved with the statutory

19

1   penalty   decision,   Moon's   motion   for   statutory   penalties   is

2   granted   and   Habib's   motion   is   denied.   Habib   is   ordered   to   pay

3   Moon   $20   a   day   for   his   failure   to   provide   Moon   with   pension

4   benefit   statements   for   two   quarters   in   2010   beginning   on   July   1,

5   2010   and   until   the   date   this   order   issues.   See   Treadwell   v.

6   Schweiker,   698   F.2d   137,   138   n.1   (2d   Cir.   1983)   (finding   a

7   calendar   quarter   to   mean   the   period   of   three   months   ending   on

8   March   31,   June   30,   September   30,   or   December   31).

9                     **b.   Penalties for Claim Two**

10              Moon   also   seeks   the   maximum   statutory   penalty   under   §

11   1024(b)(4)   for   each   of   the   eighty-seven   days   that   Habib   delayed

12   in   providing   her   the   requested   plan   documents,   arguing   the

13   penalty   should   be   calculated   from   the   date   her   counsel   mailed

14   Habib   a   request   for   Plan   documents,   February   25,   2010.

15                  **1. Bad Faith or Intentional Misconduct**

16              Habib   argues   he   did   not   engage   in   any   conduct   that

17   could   be   characterized   as   bad   faith,   and   timely   responded   to

18   Moon's   inquiry   and   request;   and   that   he   did   not   know   about   Moon's

19   DRO   until   2010.

20              Moon   argues   Habib   acted   in   bad   faith   when   he   failed   to

21   timely   provide   her   with   the   documents   she   requested   since   "if   Mr.

22   Habib   was   actually   concerned   about   an   unauthorized   request   for

23   information,   he   could   have   sent   documents   directly   to   Ms.   Moon"

24   rather   than   to   her   counsel   and   because   he   did   not,   "[h]is   delay

25   is   indicative   of   bad   faith."   (Pl. Mot. 13:15-17.)

26              Moon   has   not   shown   that   Habib's   decision   to   communicate

27   with   Moon   through   counsel   rather   than   directly   evinces   bad   faith

28   or   intentional   misconduct.

## 2.   Length of Delay

Habib argues his delay in providing Moon the requested Plan documents was reasonable under the circumstances since Moon did not provide him with written authorization that he could release the Plan documents to her counsel until June 16, 2010, and he sent her the documents eight days after that authorization was received. (Defs. SUF ¶ 244-45.) Habib also argues his delay was caused by Moon's counsel since when Habib contacted her to discuss the matter in May 2010, she did not respond. (ECF No. 100-20.)

Moon rejoins that Habib cannot justify his delay by focusing on the date Moon provided him with written authorization to release the documents because Habib did not communicate his need for Moon's written authorization until at least three months after her initial request.

Habib's explanation for his delay in waiting until June 2010 to respond to Moon's request for Plan documents in her February 25, 2010 letter is not in compliance with § 1024(b). Although Habib argues Moon did not provide him with written authorization justifying release of the documents to her counsel until June 16, 2010, Habib did not request Moon's written authorization until earlier that month. (Def. SUF ¶¶ 244-245.) Habib has shown that e-mail communications with Moon's counsel evince that Moon's counsel was not immediately responsive to his attempts to speak with her. However, the e-mails contain nothing about Moon's written authorization being required before the requested documents would be provided. (Wasow Decl. MSJ Ex. 20, ("May 31 E-mail") ECF No. 100-20) (e-mail communication between

21

1   Moon's counsel and Habib).

2                          **3.    Number of Requests**

3          Habib argues Moon's single request for Plan documents

4   weighs against imposing a penalty. Moon counters that in addition

5   to the request in her February 25, 2010 letter, her counsel also

6   told Habib on April 19, 2010 and June 1, 2010 that Habib had not

7   responded to the request in the February 25, 2010 letter. (ECF

8   Nos. 100-17, 100-19, 100-21.)

9                              **4.   Prejudice**

10          Moon has not shown that she was prejudiced by Habib's

11   delay in responding to her document request.

12          Considering the factors involved with the statutory

13   penalty decision, Moon's motion for statutory penalties is

14   granted and Habib motions is denied. Habib is ordered to pay $30

15   a day for each of the eighty days he violated 29 U.S.C. § 1024

16   from when he sent notice to Moon's counsel that he had received

17   her request for documents on March 4, 2010 until he provided the

18   documents on June 22, 2010. (Defs. SUF ¶¶ 241, 245.)

19   **C.    Claims  3-7:   Prohibited  or   Conflict   of   Interest**

20          **Transactions; Breach of Fiduciary Duty**

21          Moon seeks summary judgment on claims three through

22   five. Rush seeks summary judgment on claims three through seven,

23   and Defendants Habib and McKenna seek summary judgment on claims

24   five and six. Moon alleges in claims three through seven that

25   certain Defendants, in their capacity as a Plan Trustee, breached

26   one or more  fiduciary duties owed to the Plan.

27             **1. Application of 29 U.S.C. § 1113**

28          Defendants argue claims three through seven are barred

                                      22

by the limitations periods prescribed in 29 U.S.C. § 1113 are "to the extent they rely on any events that occurred earlier than (1) October 28, 2004, if Moon had no knowledge of the underlying events, or (2) October 28, 2007, if she had such knowledge." (Defs. Mot." 11:8-11.)

29 U.S.C. § 1113 prescribes:

> No action may be commenced . . . with respect to a fiduciary's breach of any responsibility, duty, or obligation . . . after the earlier of--
>
> (1) six years after (A) the date of the last action which constituted a part of the breach or violation, or (B) in the case of an omission the latest date on which the fiduciary could have cured the breach or violation, or
>
> (2) three years after the earliest date on which the plaintiff had actual knowledge of the breach or violation; except that in the case of fraud or concealment, such action may be commenced not later than six years after the date of discovery of such breach or violation.

### a.  Claims Three, Four and Seven Alleging Rush Breached His Fiduciary Duties as a Plan Trustee

The third, fourth, and seventh claims in the Complaint concern Rush's dual role as a Trustee of the Plan and a part owner of the Property in his individual capacity. Moon alleges while in this dual role Rush breached his fiduciary duties as Plan Trustee by entering agreements "for the payment of rent to him[self] on Plan property, . . . failing to transmit the Plan's share of the rents to the Plan," "making decisions regarding leasing, maintaining and selling the [Property]," and "placing himself in a conflicted position with respect to the Plan. . . by

23

1  taking for himself rents and tax benefits attributable to the

2  Property owned by the Plan." (Compl. ¶¶ 69, 74, 91.)

3        Rush purchased and has maintained an individual

4  interest in the Property since 1999. (Pl. SUF ¶ 14.) Moon

5  testified during her deposition that Rush is at least partially

6  responsible for managing the Property and collecting rents from

7  the tenants. (Huss Decl. Ex. 2 ("Moon Dep. Tr.") 96:11-16, ECF

8  NO. 90-2.) Rush testified during his deposition that Moon is not

9  always involved with the decisions he made regarding the

10 Property. (Waslow Decl. Opp'n, Ex. 2 (Dep. David Rush) 210:6-23.)

11 Neither party provides evidence demonstrating precisely when Rush

12 allegedly engaged in the asserted prohibited transactions.

13       Disputed evidence precludes deciding precisely whether

14 or when Moon had actual knowledge of the asserted violations and

15 when was the "latest date on which [Rush] could have cured the

16 breach or violation." 29 U.S.C. § 1113. Therefore, Moon's motion

17 on claims three and four and Rush's time barred motion on claims

18 three, four and seven are denied.

19            **b. Claims Five and Six**

20       Moon alleges in her fifth claim that in violation of

21 Defendants' fiduciary duties imposed by ERISA Defendants "failed

22 to ensure that the Plan made a determination as to qualification

23 [of Moon's DRO], [failed to] notif[y] Ms. Moon of such

24 determination within a reasonable period of time, [failed to]

25 segregate[] the assets allocated to Ms. Moon in a separate

26 account, or provide[] her with an initial accounting or periodic

27 statement of account" and "fail[ed] to properly establish written

28 procedures to determine the qualified status of the QDRO and

1    inform Ms. Moon ... of these procedures." (Compl. ¶¶ 80-81).

2         Moon alleges in her sixth claim that Defendants
3    "breached their [fiduciary] duties as Trustees . . . by . . .
4    failing to investigate, oversee, and account for the Plan's
5    investment . . . in the [Property]." (Compl. ¶ 87.)

6         Here too disputed evidence precludes deciding precisely
7    whether or when Moon had actual of the asserted violations and
8    when was the "latest date on which [Defendants] could have cured
9    the breach or violation." 29 U.S.C. § 1113. Therefore, each
10   motion is denied.

11        **2.   Claims 3, 4 and 7 Concerning Whether Rush Breached**
12             **His Fiduciary Duties to the Plan**

13        Rush seeks summary judgment on claims three, four and
14   seven, in which Moon alleges he breached his fiduciary duties to
15   the Plan, arguing "discovery . . . reveal[s] . . . no basis in
16   fact" to support the claims. (Defs. Mot. 15:19-20.)

17        Moon counters that the facts show Rush made unilateral
18   decisions regarding the sale and management of the Property at a
19   time when he was acting in a dual capacity as Plan fiduciary and
20   individual owner of an interest in the Property, which violated
21   his fiduciary duties to the Plan. (Pl. Opp'n Defs. Mot. Summ. J.
22   ("Defs. Mot. Opp'n") 22:23-24, ECF No. 115.)

23        ERISA requires that a fiduciary "discharge his duties
24   with respect to a plan solely in the interest of the participants
25   and beneficiaries and . . . for the exclusive purpose of . . .
26   providing benefits to participants and their beneficiaries." 29
27   U.S.C. § 1104(a)(1). ERISA further requires that "[a] fiduciary
28   with respect to a plan shall not ... deal with the assets of the

1  plan in his own interest or for his own account." Id. § 1106(b).

2      However, disputed factual issues concerning whether

3  Rush's actions breached his fiduciary duties preclude decision on

4  the motion. Therefore, Rush's motion on these claims is denied.

5          **3.   Claim 5 Concerning Whether Defendants Breached**

6                **Their Fiduciary Duties to the Plan**

7      Defendants seek summary judgment on Moon's fifth claim

8  in which she alleges they failed to establish written procedures

9  to determine if her DRO was qualified in violation of 29 U.S.C. §

10 1056(d)(3).

11              **a. McKenna**

12     Defendant McKenna argues he is entitled to summary

13 judgment because Moon has alleged "no facts or evidence"

14 regarding his involvement. (Defs. Mot. 122:12-13.)

15     Moon did not counter McKenna's showing that the record

16 is devoid of facts to support the claim against him with

17 "specific facts showing that there is a genuine issue for trial."

18 T.W. Elec. Serv., Inc., 809 F.2d at 630 (quoting former Rule

19 56(e)). Therefore, McKenna's summary judgment motion is granted

20 on claim five.

21              **b. Rush and Habib**

22     Rush and Habib argue they cannot be held liable for

23 failing in 1995 "to properly establish written procedures to

24 determine the qualified status of the QDRO and [and for failing

25 to] inform Ms. Moon . . . of these procedures" since they had no

26 obligation to do these things until Moon presented the QDRO to

27 the Plan Administrator in 2010.

28     Moon counters that under the terms of the QDRO,

1   presenting it to Rush was sufficient to trigger Rush's and

2   Habib's obligations to her. Moon argues it is uncontroverted both

3   that she mailed the QDRO to Rush in 1995 and that the Plan did

4   not establish written procedures to determine whether a domestic

5   relation order is qualified until fifteen years later.

6          "Upon obtaining a domestic relations order in a state

7   court proceeding, an alternate payee who seeks to establish a

8   right to payment . . . must present the order to the pension plan

9   administrator for determination of whether it is a QDRO." <u>Trs. of</u>

10  <u>Dirs. Guild of Am.-Producer Pension Benenfits Plans v. Tise</u>, 234

11  F.3d 415, 410 (9th Cir. 2000).

12          During their divorce proceeding Moon and Rush signed a

13  DRO designed to divide their community assets in the Plan. (Defs.

14  SUF ¶ 20.) Moon's family law counsel drafted the DRO, which

15  states in part: "The undersigned parties and/or fully authorized

16  agents agree . . . that the parties <u>including claimant plan</u> ...

17  shall be bound by the following orders of the court." (Wasow

18  Decl. MSJ, Ex. 8, ("DRO") ECF No. 100-8.) (emphasis added).  At

19  the time Moon and Rush signed the DRO, Rush was a Trustee of the

20  Plan.  (Pl.  SUF  ¶  3.)  The  DRO  also  contains  a

21  "Notice/Identification" section detailing how each party: Rush,

22  Moon and the Plan, was to receive notices relating to the DRO.

23  In the notice section, Rush made a handwritten interlineation to

24  the draft Moon's family law counsel prepared. (Wasow Decl. MSJ,

25  ("DRO") Ex. 8 ("DRO"), ECF No. 100-8.) The draft includes the

26  following information about the Plan's contact information:

27  "Name: Peters et al Profit Sharing Plan f/b/o David H. Rush c/o

28  Administrator: David H. Rush Address: 414 Salem Street, Chico,

1  California." (Id.) In the signed copy, Rush crossed out the word

2  "Administrator" and wrote "Trustee" in its place. (Id.) Moon

3  mailed a copy of the DRO to Rush's home address, 635 Paseo

4  Companeros, Chico, CA, 95926 in 1995. (Defs. SUF ¶ 27.) Rush

5  received the DRO, but did not share it with any other Plan

6  Trustee or the then-Plan Administrator David Fuller. (Defs. SUF ¶

7  33; Pl. SUF ¶ 12.)

8       Since Rush altered the DRO to indicate that he was a

9  Plan Trustee, but left his name as the person to receive notices

10 on behalf of the Plan, when he signed the DRO he authorized Moon

11 to send notice to the Plan through him. It is uncontroverted that

12 Moon sent Rush a copy of the DRO to his home address in 1995.

13 (Defs. SUF ¶ 27.) Defendants' argument that service on Rush was

14 improper because it was sent to his home address rather than his

15 work address as listed in the DRO is unsupported by authority.

16      Habib argues that if the Plan received notice of the

17 QDRO when Moon mailed it to Rush in 1995, then he cannot be held

18 liable for the Plan's failure to qualify the DRO at that time

19 since he was not yet a Plan fiduciary. ERISA prescribes that "no

20 fiduciary shall be liable with respect to a breach of fiduciary

21 duty under this subchapter if such breach was committed before he

22 became a fiduciary." 29 U.S.C. § 1109(b). It is undisputed that

23 Moon served a copy of the QDRO on Rush in 1995 and that in 1995

24 Habib was not yet Plan Administrator. (Defs. SUF ¶¶ 27, 36.)

25 Therefore, Habib cannot be liable for a failure to act in 1995

26 because ERISA does not make him liable for breaches that preceded

27 his role as a fiduciary. Accordingly, Habib's motion for summary

28 judgment on claim five is granted and Moon's motion for summary

1    judgment against Habib on claim five is denied.

2           Rush argues that he cannot be held liable for claim
3    five because he has never been a Plan Administrator. Moon
4    acknowledges in her motion that the provisions of ERISA she
5    alleges Rush violated in claim five, 29 U.S.C. § 1056(d)(3)(G)-
6    (H) imposes "duties . . . on pension plan administrators." (Pl.
7    Mot. 13:28) (emphasis added). However, Moon counters that even
8    though Rush was never a Plan Administrator, the Ninth Circuit's
9    precedent in Stewart permits liability against him for violating
10   section 1056(d)(3). Moon contends in Stewart, the court imposed
11   section 1056(d)(3) liability on an ex-spouse who received notice
12   of a DRO when the ex-spouse was a Plan Trustee as Rush is here.

13          Rush replies that Stewart does not create liability
14   against an ex-spouse who is not a Plan Administrator, and that
15   the ex-spouse in Stewart was both a Trustee and Plan
16   Administrator.

17          Moon has not shown that Stewart authorizes liability
18   against Rush for failing to perform a Plan Administrator's duties
19   about which she complains. Stewart concerned the function of a
20   Plan Administrator. Stewart, 207 F.3d at 1143 (holding that each
21   member of the plan's committee of plan administrator's had
22   constructive notice of the DRO once plaintiff provided it to her
23   husband who was both a trustee and member of the committee of
24   plan administrators). The handwritten changes Rush made on the
25   DRO clarified his status where he crossed out the word
26   "Administrator" next to his name and replaced it with "Trustee."
27   (Wasow Decl. MSJ, Ex. 8 ("DRO"), ECF No. 100-8.) Therefore,
28   Rush's motion for summary judgment on claim five is granted.

1        **4.   Claim 6 Concerning Whether Defendants Breached**

2             **Their Fiduciary Duties to the Plan**

3             Defendants seek summary judgment on Moon's sixth claim

4    in which Moon alleges they failed "to investigate, oversee, and

5    account for the Plan's investment[] [in the Property,]" arguing

6    Moon lacks credible evidence demonstrating the value of the

7    Property decreased between 2003 and 2009, and any alleged

8    decrease in value cannot be linked to the Defendants. (Defs. Mot.

9    19:15-20:19.)

10            Moon counters that appraisals of the Property

11   demonstrate a genuine issue as to whether the Property's value

12   decreased and that "Defendants have not demonstrated the absence

13   of any triable issues concerning their management and

14   administration of the Plan, nor have they shown by undisputed

15   facts that the Property has not suffered a diminution in value as

16   a result of their imprudent behavior." (Defs. Mot. Opp'n 25:6-8.)

17            A fiduciary's "duties are 'the highest known to law'"

18   and "[t]o enforce them, [a] court focuses on not only the merits

19   of the transaction, but also the thoroughness of the

20   investigation into the merits of the transaction." <u>Howard v.</u>

21   <u>Shay</u>, 100 F.3d 1484, 1488 (9th Cir. 1996). Each Defendant owed

22   the Plan a fiduciary duty.

23            Moon opposes the motion with evidence showing that

24   disputed facts preclude summary judgment. Moon submits the

25   following testimony on the issue of whether each Defendant

26   performed his fiduciary duties to the Plan by properly

27   investigating and evaluating the Plan's investment in the

28   Property. Rush gave deposition testimony that he did not know

                                   30

1   anything about   fiduciary obligations imposed by ERISA; Habib
2   gave deposition testimony that he did not recall the Property
3   ever being discussed at a meeting of the trustees; and McKenna's
4   gave deposition testimony that indicating he is not familiar with
5   the Plan and its administration. (Wasow Decl. Opp'n, Ex. 2 (Dep.
6   David Rush,) 40:11-13, ECF No. 116-2; Ex. 7 (Dep. Mark Habib,)
7   114:13-15, ECF No. 116-7; Ex. 10 (Dep. James McKenna,) 25:9-19;
8   29:4-17; 36:7-21; 55:9-16, ECF No. 116-10.)

9           It is uncontroverted that over time, appraisals of the
10  Property's value have decreased. The Property was valued at
11  $2,600,000 in 2003 and $850,000 in 2009 (Defs. SUF ¶¶ 173, 199.)
12  These appraisals and the Defendants' referenced deposition
13  testimony about the degree of care they used in investigating and
14  evaluating the Plan's investment in the Property preclude summary
15  judgment on this claim. Therefore, Defendants' motion for summary
16  judgment on claim six is denied.

17      **D.   Claims 8 and 9: Accounting and Conversion; Rush's**
18          **Counter-Claims for Accounting; Breach of Oral and/or**
19          **Implied in Fact Contract; and Account Stated**

20          Rush seeks summary judgment on Moon's accounting and
21  conversion claims (eight and nine) in which Moon alleges since
22  2009, Rush has wrongfully withheld from her and the Plan income
23  he obtained from the Property. These claims depend on the terms
24  of the Property income agreement between Rush and Moon. Rush's
25  counterclaims for accounting, breach of oral/and or implied in
26  fact contract and accounts stated are also based on the terms of
27  the Property income agreement.

28          Rush argues "he and Moon agreed to split income and
                                     31

1   expenses associated with [the Property] in proportion to their
2   ownership interests." (Counter Cl. Mot. 6: 17-20, ECF No. 99.)
3   Moon gave deposition testimony that under the Property income
4   agreement, Rush deposited all rents from the Property into Moon's
5   bank account, and she was entitled to retain all the rental
6   income. (Defs. SUF ¶¶ 88-89; Wasow Decl. Opp'n, Ex 1 (Dep.
7   Virginia Moon,) 94:16-23, 109:11-110:3, ECF No. 116-1.) Rush
8   rejoins the Property income agreement Moon describes is not
9   supported by "documentary evidence and [the] behavior of the
10  parties." (Defs. Mot. 21:20-22.)

11        Moon's deposition testimony and Rush's conduct create a
12  genuine issue of material fact regarding the terms of the
13  Property income agreement. Therefore, Rush's summary judgment
14  motion on Moon's accounting and conversion claims and his
15  counterclaims is denied.

16        Rush also argues his motion on Moon's accounting and
17  conversion claims and each of his counterclaims should be
18  granted, because the Property income agreement Moon testified to
19  in her deposition amounts to "federal income tax fraud," making
20  it legally unenforceable. (Defs. Mot. 21:17-21, 23:10-12.) Moon
21  testified that under the terms of their agreement, although she
22  was entitled to retain all income from the Property, she was not
23  required to report any of it on her tax returns. (Defs. SUF ¶¶
24  88-89, 93.) Rush argues such an agreement is legally
25  unenforceable, and when a court is faced with an unenforceable
26  agreement like the one Moon describes, it should "apply the[]
27  legal default," which would require "cotenants [to] share the
28  rental income received ... in accordance with their proportionate

1    undivided interests." (Defs. Mot. 23:27-24:13.)

2          Rush does not support this argument with binding
3    authority. He does not cite any supporting state law and the
4    Ninth Circuit language he does cite is dicta. (Defs. Mot. 24:4-
5    13.) Therefore, Rush has not shown the argument is suitable for
6    summary judgment.

7          For the stated reasons, Rush's motion for summary
8    judgment on Moon's accounting and conversion claims and his
9    counterclaims for accounting, breach of oral and/or implied in
10   fact contract and account stated is denied.

11       **E.   Claim 10: Waste**

12         Rush seeks summary judgment on Moon's tenth claim for
13   waste in which Moon alleges: "[u]nder Mr. Rush's negligent
14   property management, and as a result of Mr. Rush's tenant
15   selection and failure to care for the residence on the property
16   ... the appraised value of the . . . [Property] decreased from
17   $2.6 million to $850,000." (Compl. ¶ 106). Rush argues that
18   although Moon alleges Rush caused the Property value to
19   depreciate, she has not demonstrated the "actual fair market
20   valuation of the Property" or that "the decrease in [the
21   Property's] value [is attributable] to Rush." (Defs. Mot. 24:19-
22   21, 25:3-5.)

23         Moon counters with an appraiser's report showing that
24   at a time when Rush was involved in maintaining the Property, it
25   fell into such disrepair that "it would not be financially
26   feasible to rehabilitate" it because the cost of repair could not
27   be recaptured even if the Property was sold. (Huss Decl. MSJ, Ex
28   52 (Johnson Appraisal Report) at 35, ECF No. 93-1; Wasow Decl.

1    Opp'n, Ex. 2 (Dep. David Rush,) 24:1-8, ECF No. 116-2.)

2         Rush replies that the referenced appraiser's report is
3    based "on an 'extraordinary' hypothetical condition," that "has
4    never occurred and is highly unlikely to occur . . . ." (Defs.
5    Mot. 20:1-7.)

6         In California, "[w]aste is a tort actionable for the
7    protection of an owner of an interest in land." <u>Cal. Dep't. of</u>
8    <u>Toxic Substances Control v. Payless Cleaners, College Cleaners</u>,
9    368 F. Supp. 2d 1069, 1082 (E.D.Cal. 2005); <u>see also</u> Cal. Civ.
10   Code § 732. Waste includes "conduct, by both commission and
11   omission, on the part of the person in possession of the property
12   which impairs the value of the lender's security." <u>Evans v. Cal.</u>
13   <u>Trailer Court, Inc.</u>, 28 Cal. App. 4th 540, 553 (1994).

14        The appraisal report on which Moon relies could support
15   drawing a reasonable inference that the Property's value
16   decreased during the period Rush managed it. (Huss Decl. MSJ, Ex
17   52 (Johnson Appraisal Report) at 35, ECF No. 93-1; Wasow Decl.
18   Opp'n, Ex. 2 (Dep. David Rush,) 24:1-8, ECF No. 116-2.) Although
19   Rush challenges the credibility of this appraisal, "[c]redibility
20   determinations. . . [are a] jury function[], not [the function
21   of] of a judge, whether ruling on a motion for summary judgment
22   or for a directed verdict." <u>Anderson</u>, 477 U.S. at 255.

23        Therefore, Rush's summary judgment motion on Moon's
24   waste claim is denied.

25        **F.   Claim 11: Declaratory Relief**

26        Defendants seek summary judgment on Moon's declaratory
27   relief claim in which she requests "a declaration from the Court
28   that [she] is a beneficiary under the Plan and is entitled to a

1  segregated account within the Plan." Defendants argue Moon fails
2  to show she would benefit from declaratory relief since she "has
3  always personally received the benefit of the income from the
4  Plan's ownership interest in the Property." (Defs. Mot. 25:12-
5  14.)

6          However, Moon provides evidence that she has not
7  received any income from the Property in her individual capacity
8  or in her capacity as the Plan beneficiary since 2009. (Pl. SUF ¶
9  20.) Therefore, Defendants' summary judgment motion is denied.

10  **G.   Moon's Statute of Limitations Defense against Rush's**
11       **Accounting Counterclaim**

12          Rush seeks summary judgment on Moon's statute of
13  limitations defense asserted against his accounting counterclaim.
14  Moon asserts Rush's accounting counterclaim is time-barred
15  because she ceased reimbursing him for Property expenses in 2003,
16  yet Rush did not raise his accounting counterclaim until well
17  after the statute of limitations expired.

18          Rush counters that the statute of limitations on this
19  claim did not begin running when Moon ceased reimbursing him in
20  2003 because, at that time, Moon continued to perform additional
21  obligations under the agreement by paying property taxes and
22  alarm monitoring expenses on the Property. Rush argues because
23  Moon continued to perform some of her contractual obligations,
24  the waiver of breach doctrine permitted Rush to "treat the
25  contract as still alive" by performing his obligations until he
26  decided to treat the contract as breached and ceased performing
27  his own obligations. Rush asserts he treated the contract as
28  breached in 2009 when he stopped depositing the Property's rental

1   income into Moon's account. Rush contends, therefore, the statute

2   of limitations on his accounting counterclaim began to run in

3   2009 when he failed to remit the rental income to Moon; and thus,

4   his claim was still timely when the parties entered into a

5   tolling agreement in 2010. (Counter Cl. Mot. 9:11-13.)

6        Moon replies that her agreement to pay property taxes

7   and alarm monitoring expenses on the Property was a separate

8   agreement from the Property income agreement and, therefore,

9   California law did not entitle Rush to "treat the contract as

10  still alive" when she ceased reimbursing him for expenses in

11  2003.

12        In California, "when there are ongoing contractual

13  obligations [under an agreement and one party ceases to perform

14  some of his or her contractual obligations,] the [other party to

15  the agreement] may elect to rely on the contract despite a

16  breach, and the statute of limitations does not begin to run

17  until [that party] has elected to treat the breach as terminating

18  the contract." Romano v. Rockwell Internat., Inc., 14 Cal. 4th

19  479, 489 (1996) (citing 1 Witkin, Summary of Cal. Law, (9th ed.

20  1987), Contracts, §§ 800-801, pp. 723-724).

21        Disputed factual issues exists on the question whether

22  Moon's agreement to pay property taxes and alarm monitoring

23  expenses was part of the Property income agreement or part of a

24  second subsequent agreement that preclude granting the motion.

25  Therefore, Rush's summary judgment motion is denied on this

26  issue.

27  ///

28  ///

1                          IV.   CONCLUSION

2              For the stated reasons, Plaintiff's summary judgment

3    motion is GRANTED IN PART and DENIED IN PART; Defendants' summary

4    judgment motion is GRANTED IN PART and DENIED IN PART; and

5    Counter-claimant's summary judgment motion is DENIED.

6    Dated:   December 19, 2014

7

8                              _____

9                              GARLAND E. BURRELL, JR.
                               Senior United States District Judge

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

                                    37